RENDERED:  JUNE 20, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0124-MR

EARL K. JOHNSON                                                                    APPELLANT

ON APPEAL FROM LOGAN CIRCUIT COURT
V.            HONORABLE JOE W. HENDRICKS, JR., JUDGE
NO. 19-CR-00158

COMMONWEALTH OF KENTUCKY                                      APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

Earl K. Johnson was convicted after a jury trial on four counts of complicity to traffic in a controlled substance (methamphetamine); one count of engaging in organized crime, criminal syndicate; and one count of complicity to murder regarding the shooting death of Bob Wetton.[1] After the jury determined Johnson was a persistent felony offender in the first degree (PFO-1), the Logan Circuit Court sentenced him in accordance with the jury's recommendation to a total sentence of life in prison.

Johnson appeals to this Court as a matter of right. He argues various trial errors. The most serious error Johnson raises is that he was denied his constitutional right to confrontation pursuant the 6th Amendment of the

---

[1] We refer to Bob and his wife, Pam Wetton, by their first names to avoid confusion. We refer to them collectively as the Wettons.

United States Constitution and Section 11 of the Kentucky Constitution when a key witness, Pam Wetton (Bob's widow), was allowed to testify remotely for her convenience due to health concerns. As Pam's remote testimony violated Johnson's right to confrontation and was not harmless beyond a reasonable doubt as to his trafficking convictions, we reverse those convictions and sentences and remand. We affirm Johnson's convictions and sentences for engaging in organized crime, criminal syndicate, and complicity to murder as Pam's remote testimony was harmless beyond a reasonable doubt as to those convictions, due to the overwhelming evidence regarding his guilt as presented by other witnesses' testimony and conclude any other trial errors do not require reversal of these convictions and sentences.

## I. FACTUAL AND LEGAL BACKGROUND

On August 26, 2015, Bob was murdered. The previous month, Bob was arrested in Arizona for methamphetamine trafficking. The prosecution alleged that Bob was transporting the methamphetamine in his possession back to Johnson (also known as "Tooter") as part of a fourth "drug run" Bob had taken with his wife Pam, in which they traveled from Kentucky to Arizona to obtain methamphetamine at Johnson's direction.

After Bob's murder, Johnson was arrested on related charges and incarcerated in Logan County. Before Johnson could be arraigned, he was extradited to face charges in Arizona related to the drug trafficking involving the Wettons.

2

On May 17, 2019, a Logan County grand jury indicted Johnson on: four counts of conspiracy to first-degree trafficking, first offense (for the four times the Wettons traveled to Arizona to purchase methamphetamines for Johnson, on or about April 30, 2015, June 3, 2015, June 18, 2015, and July 8, 2015); engaging in organized crime, criminal syndicate (involving Johnson, Bob, Pam, Shawn McDevitt, and Joshua Gerst); murder (Bob); conspiracy to murder (Bob); and being a PFO-1. That same day, the grand jury also indicted Johnson's girlfriend, Carolyn Kinder, for complicity to commit murder and PFO-1.

Johnson's Logan County, Kentucky case remained stagnant as Johnson was serving a sentence in Arizona. On April 22, 2021, Johnson filed Form 1, of the Interstate Agreement on Detainers in which he gave notice of the untried indictment, requested disposition of the charges and speedy trial, and requested final disposition (thus waiving his right to object to extradition). Johnson subsequently appeared in the Logan Circuit Court on July 27, 2021, and waived formal arraignment on the indicted charges.

Kinder was tried in March 2021 for conspiracy to commit the murder of Bob. The jury found her guilty, and she received a twelve-year sentence.

On July 29, 2022, the grand jury indicted Johnson on a superseding indictment which provided alternate counts. It returned no true bills on the four charges of conspiracy to trafficking, instead finding true bills on four alternative counts of complicity to first-degree trafficking. The grand jury returned a no true bill for the murder charge and the conspiracy to murder

3

charge, instead finding a true bill for the charge of complicity to murder. The other charges remained the same.

A third person, Kristen Leann Day, was also indicted on related charges: engaging in organized crime, criminal syndicate; complicity to murder; and PFO-2. On January 3, 2023, she pled guilty to the amended charge of criminal facilitation of murder, with the other charges dismissed, pursuant to a plea agreement. Immediately after Johnson's conviction, Day received a five-year sentence, probated, which was entered on January 25, 2023.

On January 12, 2023, the trial court granted the Commonwealth's request to amend Johnson's superseding indictment to have his trafficking charges amended to complicity to trafficking in controlled substances, first offense, for two grams or more of methamphetamine, and to amend the underlying criminal history supporting the PFO-1 charge.

Johnson's trial began on January 17, 2023. Kinder declined to testify in Johnson's trial as her appeal was pending.

Pam testified via Zoom. She explained that she and Bob began using cocaine around 2005 and then later started using methamphetamine. Pam retired in 2009 and shortly thereafter Bob received disability. For two or three years, they regularly purchased methamphetamine from Johnson a gram at a time, two or three times a week.

Pam explained that later, when she and Bob were having money problems, they agreed to transport methamphetamine for Johnson from Arizona to Kentucky. They did this four times in 2015, the first time

4

accompanied by Johnson and the three other times with just the two of them as Johnson told them he thought an older couple traveling together would be less suspicious. She testified that she was only peripherally involved in this drug running as Bob and Johnson handled most of the coordination of the details of these trips; Bob handled the money and getting the drugs to Johnson.

Pam explained that each time, Johnson provided a vehicle for them to use, gave them money to purchase the methamphetamine in an ammunition box, paid them money for their expenses, arranged for his contact to pick them up after they called Johnson and told them they had arrived, and paid them afterwards for the job. Several different vehicles were used for these trips, including a Chevy Impala, a Jeep, and a Hyundai Santa Fe. The person that met them varied, but the basic method they followed did not.

Pam testified that on their first solo trip in the spring of 2015, they picked up a package which weighed somewhere between three and five pounds, were given $1,200 to cover their expenses, and money in an ammunition box to cover the purchase of the drugs. They drove to Arizona, contacted Johnson, and Johnson's contact then came to where they were staying and brought them to his house. The man weighed the money and then gave them the methamphetamine, which they then stored in the ammunition box. After returning to Kentucky with the drugs, Johnson paid them. Pam was unsure of the exact amount, as Bob handled those details, but estimated it was between $3,000-$5,000.

On the Wettons' second solo trip, which may have been in June 2015, Pam explained the cash to purchase the drugs was packed the same way and they met the same people. Pam believed they purchased eight pounds of methamphetamine and were paid a few thousand dollars. The same general procedure was followed again.

On the Wettons' final trip to Arizona in July 2015, Pam testified they took a large amount of cash with them which was bundled in rubber bands and kept in the ammunition box. They bought twenty pounds of methamphetamine but were pulled over by the police, who found the methamphetamine pursuant to a search.

Pam explained they were arrested and eventually cooperated, implicating Johnson. This included Pam agreeing to testify against Johnson. In accordance with the urging of law enforcement, Bob contacted Johnson and requested that Johnson wire him money to address car problems. Johnson sent the money. After about a week in jail, they were able to get a relative to post bond and fly home in early August. While both Pam and Bob repeatedly tried to reach Johnson, he would not respond, and Pam was not sure if Bob ever reached him.

On August 26, 2015, at about 4 pm, Pam testified she went to Wal-Mart for groceries, leaving Bob working on a motorcycle in their front yard. Pam was gone about an hour and a half and did not see Bob when she came in but did not think anything of it. She started to wonder where Bob was when it started to get dark outside.

6

Pam went looking for Bob and eventually found him dead under a sheet in their tobacco barn. Pam saw blood around Bob's head and called 911 at 7:08 p.m.

Bob had been shot in the head, with the coroner suspecting that he had been shot elsewhere as there was not much blood where his body was discovered. The coroner reported his death as a homicide. There was no physical evidence specifically linking Bob's death to any suspects.

The police were able to confirm Pam's presence at Wal-Mart and believed Bob was killed sometime between two and seven p.m. The police were already aware of Pam's and Bob's legal trouble in Arizona.

Pam confirmed to the police that she and Bob had been making drug runs to Arizona for Johnson. She showed them text messages that Bob had sent to Johnson asking him for money while they were incarcerated in Arizona.

The police had Johnson come in for an interview early the next day. During the interview, Johnson revealed he already knew about Bob's death; Johnson claimed to have heard about Bob's death from his son Jeremiah Johnson. Johnson described Bob as his friend and admitted knowing he had been arrested in Arizona for dope. Johnson stated he had not seen Bob recently, but in texts Bob had asked for money. Johnson provided an account of his whereabouts on the day of the murder which included alibi witnesses. He explained Day, Taylor Wilson, and his girlfriend Kinder, were in his home and he went out with them, and he mowed Anna Hightower's yard.

7

Two days later, the police obtained search warrants for Johnson's home and vehicles. When the police stopped him in his vehicle with Kinder, they found multiple cell phones, $3,000 cash, and drugs on Kinder's person. They arrested Kinder.

Johnson returned to his home with police. They found more cell phones, ammunition boxes, drug paraphernalia, and residual amounts of methamphetamine. He was arrested. Police searched Johnson's Jeep but were not able to locate his other vehicle, a Santa Fe.

Larry Talley testified he had known Johnson for over ten years. Talley recounted seeing Johnson at a mutual friend's home in early 2017, and when Talley brought up the subject of Bob's death with Johnson, Johnson said he took care of it. As incentive for his testimony, Talley admitted he was hoping he would receive long-term treatment instead of jail time on unrelated pending charges.

In September 2015, Kinder was incarcerated in the Logan County Detention Center while awaiting trial on her drug charges. Several inmates shared a cell with Kinder, including Amber Deberry, Angela Hampton, Debra Spangerberger, and Gloria Castile. Kinder made various statements to her cellmates or in front of them, which both incriminated her and implicated Johnson in Bob's murder. These inmates subsequently came forward and reported Kinder's statements and then testified against her.

In Johnson's trial, the Commonwealth moved for a ruling on whether Kinder's statements were admissible and received a favorable ruling. These

inmates subsequently testified against Johnson. The propriety of this ruling was not challenged on appeal.

Deberry testified Kinder told her and several other women that she and someone named "Tooter" were supposed to go mow Hightower's yard, but someone got shot. Deberry described Kinder as jumping from topic to topic. Deberry also recounted that Kinder talked about how someone had gotten in trouble in Arizona and had snitched on someone.

Hampton heard Kinder speaking on the phone and heard her describing a murder committed by "her and her old man" that resulted from a drug deal gone bad and that a body had been left in a barn. Hampton also heard Kinder say she had sold the car used and needed to get it back because there was evidence in it.

Spangerberger testified that Kinder told her that Kinder and "Tooter" had picked up a guy, asking if he would come and mow a yard with them and then shot him in the head. She said Johnson shot him "point blank" in the head and they took his body to a barn and left it. Kinder also told Spangerberger that someone had snitched, and Johnson wanted to take him out. Spangerberger also heard Kinder on the phone worrying about a truck several times because that was where someone was shot.

Castile testified that Kinder was frightened. She heard Kinder talk about how she was in for methamphetamine but was going to be in "big trouble." Kinder kept repeating "there was blood everywhere." Castile testified that Kinder also told her that the "big boys" from Arizona paid her and Johnson in

9

drugs and money to kill a snitch. Kinder said Johnson drove the snitch out on a dirt road in a Mercedes, pulled into a barn, and shot him in the head. Castile also recounted hearing Kinder on the phone worrying about a truck.

Pursuant to a warrant for cell phone records relating to Kinder's phone, police were able to establish with an accuracy of 400 to 5,000 meters, that Kinder's phone was within a four-minute drive to Pam's and Bob's property at 4:50 p.m. on the day of Bob's death but could not establish her phone was at their property.

Day testified she grew up in Logan County and her mother used to date Johnson. Day called Johnson "Daddy" and thought of him as a father figure because he would do things for her like give her money and let her live with him. She testified she lived with him when she was twenty-six years old and would sell methamphetamine for him in exchange for a cut of the money. Later, Day became aware that Johnson was at the center of a drug distribution web stretching over Logan, Todd, Butler, and Warren Counties. She explained that once Johnson began getting drugs from Arizona, the quantity of drugs he was distributing greatly increased.

Day testified she made one trip to Arizona with Johnson, Pam, Bob, Marty Stokes and Kelly Taylor so Johnson could meet up with his "main guy" in the methamphetamine operation. After he left to meet up with a couple of people, Johnson returned with an ammunition box full of drugs. Day also explained she knew that Pam and Bob would be making more trips to Arizona after this to bring drugs to Kentucky.

10

Day testified that for Pam's and Bob's last trip, Johnson "crowdsourced" $80,000 to send to Arizona with them. She also explained she helped Johnson wire money to Bob for car trouble.

Day explained that after Johnson learned Pam and Bob had been arrested, he became very nervous and told her, "A rat has to die." That same day, Johnson told Day that she would be his alibi.

On August 26, 2015, Johnson told Day that he was taking money over to Billy Hightower when he mowed Anna Hightower's lawn and Billy would handle something for him. Day testified she knew then that Bob would be killed that day and was not surprised when Bob ended up dead.

Day testified that after Johnson returned from mowing Hightower's yard, he took Day and Wilson with him to Bowling Green and Richardsville. When they returned, Johnson received a phone call and told Day that Billy had "handled it" and that they needed to get all the drugs out of the house and leave. Day testified that Johnson instructed her that if the police asked about his whereabouts that day, she was to tell them that he had mowed Hightower's lawn and then went to Bowling Green with her. She explained she told the police the truth when she was questioned because Johnson made sure she was with him and could tell the police about it later.

After cross-examination questioning of her changed story, the trial court permitted the prosecution on redirect to ask Day about her various types of relationships with Johnson. Day testified that she also had a sexual relationship with Johnson, which began when she was twenty-six, and that she

11

exchanged sex for methamphetamine. This relationship continued until around the time Bob died. Day explained her relationship with Johnson was complicated and she felt the need to be loyal to him.

Bobby Elamon testified that while he was incarcerated with Johnson, Johnson asked him to pass on a message to Day when Elamon and Johnson would be transported together for a court appearance. Elamon told Day not to take a deal or say anything in their case because he had information that might help them. Day testified she interpreted this message as a threat that she needed to remain loyal.

Prosecution witness Ricky Plunk, Day's cousin, described Johnson's relationship with Day as "weird" and he assumed Johnson and Day were having sex. Plunk sometimes bought methamphetamine from Johnson, but preferred to get it from Day because it was cheaper from her.

Plunk testified he was asked about picking up drugs from Arizona but did not take the request seriously. Plunk recounted Day told him he could be rich if he would just make two trips. Plunk testified that Johnson asked him to make methamphetamine, but Plunk declined.

Plunk overheard Johnson talking about sending someone money through Western Union for car troubles. He also heard Johnson offer to pay Kenneth Hankins to "kill that motherf***er." Plunk did not know Pam and Bob, but his mother did. Plunk testified that around the time of Bob's death, Plunk heard Johnson tell Day to get her story straight.

12

Hankins testified that he had known Johnson most of his life, had shared drugs with Johnson, and had been staying on Johnson's couch when Bob was killed. Hankins remembered Johnson would keep pounds of methamphetamine in his house at any given time; some would be inside the house, and some would be hidden in the property around the house. However, Hankins never saw anything close to twenty pounds of methamphetamine.

Hankins recounted making a trip out west for Johnson. Hankins and Stokes drove out to California but were unable to find a connection there, so Johnson directed them to go to Phoenix. They were only able to get four or five ounces of drugs on that trip, which Hankins described as a "test run."

Hankins testified he heard that Pam and Bob started taking trips to Arizona for Johnson, heard that their last trip had gone wrong, knew they got arrested, and heard Johnson was concerned they were cooperating with the police. Hankins also recounted that Johnson told Hankins that the guys in Phoenix gave him a call and instructed him to take care of "loose ends" or they would come to Kentucky and take care of everyone.

Hankins stated he was incarcerated at the time of Bob's death and did not know what happened to him. Hankins admitted he had been offered immunity for his role in trafficking with Johnson and an offer of probation on a new case he had accrued.

Stokes testified he had known Johnson for a few decades. Stokes previously lived in Arizona and connected Johnson to people to get methamphetamine in that area. Stokes testified he believed that Johnson was

purchasing twenty pounds or more at each visit at $3,500 to $4,000 per pound. Stokes explained that he did not know Bob, but was aware Johnson had someone else to make trips for him and that person was named Bob.

Stokes testified that he was paid $5,000 per trip for calling someone in advance to meet up with Johnson or whomever he sent to buy the drugs. There was a problem on the second trip Stokes helped arrange as the people Johnson sent were arrested, so Stokes did not get paid.

Stokes testified that Johnson told him the people arrested got out on a $1,500 bond. Stokes found that amount suspicious because he had been in trouble for methamphetamine in Arizona before. Stokes explained he told Johnson to cut ties with Bob. Stokes admitted he had been granted immunity from prosecution in exchange for his testimony against Johnson.

Regarding the day of the murder, Hightower confirmed that Johnson mowed her yard that day at around the time Johnson said he did. Hightower testified that her father-in-law Billy was incarcerated when Johnson mowed her lawn. Jail records confirmed this also.

Day and Wilson generally confirmed Johnson's account of his location on the day of the murder. However, Day also claimed she saw Johnson take money out of one of his hiding places to give to Hightower's father-in-law Billy while Johnson was there to mow so that Billy could "handle something for him." Day assumed Johnson was referring to Bob. Day recounted that when Johnson got back, she saw Johnson covered in grass. Johnson told her that "Billy handled it."

14

Day testified that Johnson later received a phone call and made them leave. Wilson confirmed being told to leave but thought it was related to a drug run. Wilson did not recall anything Johnson did that day which made her think anything unusual was going on that day.

On January 25, 2023, the jury found Johnson guilty on each count for which he was tried: four counts of complicity to traffic in a controlled substance (methamphetamine), first degree, Kentucky Revised Statutes (KRS) 218A.1412(1)(b)[2]; one count of engaging in organized crime, criminal syndicate, KRS 506.120[3], with the syndicate being for the purposes of illegal trafficking in controlled substances; and complicity to murder, KRS 507.020 and KRS 502.020.

The jury recommended that Johnson initially receive sentences of ten years on each of the complicity to traffic counts, which were enhanced to twenty years based on his PFO-1 status, twenty years on the engaging in organized crime criminal gang syndicate, enhanced to fifty years, and a life sentence for complicity to murder. The jury recommended that the trafficking and organized crime sentence be served consecutively for a total of seventy

---

[2] Since 2011, KRS 218A.1412(1)(b) has only required trafficking two or more *grams* of methamphetamine. 2011 Kentucky Laws Ch. 2 § 9 (HB 463). The testimony regarding Johnson's complicity to trafficking involved *pounds* of methamphetamine. To put this in perspective, there are approximately 453 and one-half grams in a pound.

[3] Johnson was tried under the prior version of KRS 506.120(3)(e). It required five participants to establish a "criminal syndicate." 2018 Kentucky Laws Ch. 202 § 3 (HB 169) amended KRS 506.120. Among its changes were rebranding this crime as "criminal gang syndicate," and lowering the required number of participants to three. KRS 506.120(3) (eff. April 26, 2018).

years. The trial court sentenced Johnson in accordance with these recommendations, making the twenty years on each of the trafficking counts concurrent to each other but consecutive to the fifty years on the organized crime, criminal syndicate conviction for a total of seventy years, and made that concurrent to his life sentence on complicity to murder. Johnson subsequently was returned to Arizona to complete his outstanding sentence there. When Johnson is released from incarceration in Arizona, he will be returned to Kentucky to serve his sentence in this case.

## II. ISSUES

Johnson argues that the trial court erred by: (1) permitting Pam to testify via Zoom in violation of Johnson's right to confrontation; (2) admitting testimony relating to other crimes and bad acts in violation of Kentucky Rules of Evidence (KRE) 404; (3) permitting hearsay statements from his deceased son in violation of Johnson's right to confrontation; and (4) denying his motion for a mistrial when the Commonwealth played a portion of Johnson's police interview that revealed he was a convicted felon. He also argues, (5), that these errors amount to cumulative error.

### A. Did Pam's Testimony via Zoom Require Reversal for Violating the Confrontation Clause?—Preserved

Although Johnson acknowledges that we have generally interpreted Section 11 of the Kentucky Constitution coextensively with the Sixth Amendment to the United States Constitution regarding the Confrontation Clause, he argues that we should interpret our Confrontation Clause to provide a more extensive right as it requires a "face to face" confrontation. Johnson,

16

therefore, seeks to have us interpret Section 11 as prohibiting Zoom testimony of a material witness.

Johnson further argues that the Commonwealth cannot satisfy the standards excusing confrontation set out in *Maryland v. Craig*, 497 U.S. 836 (1990), because the Commonwealth failed to establish there was an important public policy at stake as well as necessity, as the failure to make Pam travel for court was more attributable to ideas of convenience (travel would be difficult or uncomfortable due to her medical conditions), rather than necessity. Johnson also argues that it cannot be harmless error beyond a reasonable doubt to have permitted Pam's Zoom testimony because this trial differs significantly from Kinder's trial. Johnson explains that there were jail snitches to Kinder's admissions tying the murder to her, and Johnson was also being tried for multiple counts of complicity to trafficking in controlled substances, and organized crime, charges for which Pam's testimony about her and Bob's actions was the primary evidence.

**1. Underlying Facts and Court Ruling**

On June 14, 2022, the Commonwealth filed a motion requesting that Pam be allowed to testify by two-way video conferencing, arguing "the public has an interest in making sure that crucial evidence regarding a murder and drug trafficking is heard by the jury and that the health of the witness should not be a bar or obstacle to the presentation of said evidence." The Commonwealth submitted a letter from a physician's assistant regarding this request. It read:

The above-named individual is currently under my care. She tells me that there has been another request for her to travel for an ongoing court case. She is concerned about the request because of the physical toll of travel. She does have severe arthritis in both of her knees and is not able to walk very far without significant pain. She also has coronary artery disease and paroxysmal atrial fibrillation. She does get short of breath with exertion. Ms. Wetton is willing to make the court appearance through teleconference. I agree that travel would be difficult for her and kindly request that she be granted the opportunity to provide information remotely.

Johnson immediately objected to the Commonwealth's motion to permit Pam to appear by two-way videoconferencing, specifically citing the Sixth Amendment and Section 11 in arguing that they "do not allow witness testimony where the witness does not have to face the accused face-to-face." He argued permitting Pam to testify remotely would deny him due process of law:

[I]n that the jury will not be able to judge the demeanor, facial expressions, body language or other nonverbal indications of the emotions the witness is feeling while testifying, or other clues as to the veracity of their testimony, to the extent that the jury will not be able to view the entire testimony of the witness as a whole.

Johnson further argued: "If the witness is allowed to testify in this manner, then it will be impossible to tell if someone is on the other side of the camera coaching the witness, feeding them answers to questions, or otherwise providing impermissible feedback."

Johnson specifically objected to the application of *Craig*, arguing "Kentucky has codified the only public policy it believes necessary to trigger the *Craig* exception in KRS 421.350" to allow video testimony of a child victim who is less than twelve years of age where there is a "substantial probability that the child would be unable to reasonably communicate because of serious emotional distress produced by the defendant's presence." He also argued that

18

the Kentucky Rules of Criminal Procedure (RCr) 7.10 *et. seq.* "contemplate this very scenario, and allow for depositions to be taken while still protecting the rights of the Defendant" and objected to the Commonwealth's failure to even consider deposing Pam and instead proposing using remote testimony that would deny Johnson one of his fundamental constitutional rights.

On December 1, 2022, the trial court held a hearing on this issue. The Commonwealth told the trial court that Pam's health issues had not improved since the letter was filed and noted that Pam was currently unable to drive, needed cataract surgery, and was only able to walk minimal distances. The Commonwealth argued that based on her physical condition, Pam was unable to travel. The Commonwealth offered to have Pam participate in this hearing by phone but did not call her as a witness as to her physical condition, and the trial court declined to try to reach her.

Johnson explained that a potential appropriate option would be to take Pam's video deposition in Nebraska, with Johnson and his attorney present, so that Johnson would have his right to confrontation satisfied. Johnson noted that the Commonwealth had not requested a deposition.

While Johnson acknowledged that Pam could have difficulty traveling, he disagreed that Pam was completely unable to travel or that her physical difficulties could trump his right to confrontation. He argued that it was his position that Pam needed to personally appear to testify.

The Commonwealth raised the concern that when it came to the jury judging Pam's credibility that a recorded video deposition was not an

19

improvement over live testimony via Zoom. The Commonwealth also argued that it was good public policy to not require unnecessary public expenditures.

On December 19, 2022, the trial court orally granted the Commonwealth's motion that Pam be permitted to provide her testimony remotely. The trial court explained it would require that there be a laptop showing Johnson, so that Pam and Johnson could see each other, and opined this would satisfy Johnson's confrontation rights. The trial court never issued a written order. The trial proceeded in January with Pam testifying via Zoom.

Nine months after Johnson was convicted, the Court of Appeals issued an opinion resolving Kinder's direct appeal and affirmed her conviction and sentence. *Kinder v. Commonwealth*, 2021-CA-0978-MR, 2023 WL 7392540 (Ky. App. Nov. 9, 2023) (unpublished). The Court of Appeals agreed with Kinder that the trial court permitting Pam to testify remotely via Zoom in Kinder's trial violated Kinder's right to confrontation. *Id.* at \*2-3. However, the Court of Appeals concluded such violation was harmless beyond a reasonable doubt where the remaining evidence overwhelmingly established Kinder's guilt. *Id.* at \*3.

**2. The Confrontation Clause and the *Craig* Test**

Among the rights that criminal defendants have, is the right to confrontation. The Sixth Amendment to the United States Constitution says in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" Similarly, Section 11 of the

Kentucky Constitution provides: "In all criminal prosecutions the accused has the right . . . to meet the witnesses face to face[.]"

In *Craig,* 497 U.S. at 840, the United States Supreme Court had "to decide whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television." The Court ultimately ruled that it did not, explaining as follows:

> [W]e conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

*Id.* at 857.

The reach of the *Craig* decision was broader than just pertaining to protecting child victims. As the United States Supreme Court explained: "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial *only where denial of such confrontation is necessary to further an important public policy* and *only where*

21

*the reliability of the testimony is otherwise assured." Id.* at 850 (emphasis added).

As to the "necessary" prong, while serious illness may be sufficient to satisfy this prong, "[t]here is also a general consensus among courts that mere convenience, efficiency, and cost-saving *are not* sufficiently important public necessities to justify depriving a defendant of face-to-face confrontation."[4]

In *United States v. Yates*, 438 F.3d 1307, 1314-18 (11th Cir. 2006), the Court determined there was no necessity to allow remote testimony even though the witnesses were in Australia, explaining that they could have been deposed there pursuant to the Federal Rules of Criminal Procedure (Fed. R. Crim. P.) 15. A narrow interpretation of *Craig* would never permit remote testimony when a video deposition could have been conducted.[5]

Kentucky provides for admission of depositions in criminal trials pursuant to Kentucky Rules of Criminal Procedure. Depositions are permitted to be taken

> [i]f it appears that a prospective witness may be unable to attend or is or may be prevented from attending a trial or hearing or is or may become a nonresident of the Commonwealth, that the witness's testimony is material and that it is necessary to take the witness's deposition in order to prevent a failure of justice[.]

RCr 7.10(1). The Commonwealth could have properly deposed Pam under this rule and the trial court should have issued a ruling requiring that the

---

[4] *Elements of the Confrontation Clause*, 8 Handbook of Fed. Evid. § 808:1 (9th ed.) (emphasis added).

[5] *See* Ayyan Zubair, Note, *Confrontation After Covid*, 110 Calif. L. Rev. 1689, 1710-11 (2022) (advocating such an interpretation).

Commonwealth depose Pam rather than granting its motion to permit her remote testimony.

### 3. The *Craig* test as applied in Kentucky under Section 11

We originally considered *Craig* in determining whether "TV testimony" by child witnesses was permissible pursuant to KRS 421.350 and was otherwise constitutionally permissible. *See, e.g., George v. Commonwealth*, 885 S.W.2d 938, 940-41 (Ky. 1994).

Although we have questioned the continuing validity of *Craig*, as its analytical foundation was based upon the balancing test set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980), which was overruled by *Crawford v. Washington*, 541 U.S. 36, 54 (2004)), we still apply its framework to any alleged confrontation errors. *Faughn v. Commonwealth*, 694 S.W.3d 339, 346 (Ky. 2024) (relying on analysis in *Campbell v. Commonwealth*, 671 S.W.3d 153, 159-60 (Ky. 2023), and *Spalding v. Commonwealth*, 671 S.W.3d 693, 697 (Ky. 2023)).[6]

Neither convenience nor expense are authorized grounds for allowing remote testimony as we have repeatedly held. In *Faughn*, 694 S.W.3d at 347, the trial court permitted remote testimony by a lab technician in Pennsylvania about results of blood analysis in order to save the Commonwealth the cost of travel expenses, and by a University of Kentucky professor, Ward, about

---

[6] *See generally* Marc C. McAllister, *The Disguised Witness and Crawford's Uneasy Tension with Craig: Bringing Uniformity to the Supreme Court's Confrontation Jurisprudence*, 58 Drake L. Rev. 481, 507-514 (2010) (discussing the tension between *Craig* and *Crawford*).

toxicology due to his class schedule. We soundly rejected these justifications

for denying the defendant the right to confrontation:

> The reasons proffered by the Commonwealth to explain why their witnesses needed to testify remotely fall well short of public policies that could outweigh Faughn's constitutional right to confront those witnesses. While we applaud the Commonwealth for their commitment to the financial well-being of Kentucky's prosecutorial system, a savings of ten to fifteen-thousand dollars cannot outweigh a defendant's constitutional rights. Similarly, while we can appreciate Ward's reluctance to cancel his classes and of the Commonwealth's efforts to accommodate Ward and his students, the relatively minor inconvenience to Ward does not in any way approach the gravity needed to deprive Faughn of his right to confront Ward in person. *See Campbell*, 671 S.W.3d at 161 ("Thus, by allowing [Commonwealth's witness] to testify via Zoom as a convenience to him, the trial court erred[ ]"). As noted by Faughn, if Ward wishes to engage in the business of testifying as an expert witness, he should be prepared to forego other obligations in pursuit of that endeavor. Accordingly, the circuit court erred in allowing the Pennsylvania lab employee and Ward to testify remotely.

*Id.*

In *Spalding*, 671 S.W.3d at 698, the trial court permitted remote

testimony by three chain of custody witnesses who had moved, with later

justification provided by the fact that one witness had a commitment at the

state fair, another witness had Covid, and no additional reason ever being

provided for the third witness's absence. We again soundly rejected such

justifications as being sufficient to overcome the defendant's right to

confrontation:

> While a witness sick with Covid could arguably be a compelling need justifying remote testimony under the *Craig* standard, the trial court made no such finding, and this was not mentioned during either discussion of remote testimony. The first time Covid was mentioned was during the Commonwealth's opening argument and the record is not clear whether Spalding had been informed of

24

this before the jury was. Had this been discussed with Spalding prior to the commencement of the trial, the trial court could have advised Spalding whether he wished to continue the trial so the ailing witness could be physically present and thereby waive his right to a speedy trial or carry on with the trial with the witness testifying remotely. As for Lt. Brad Riley, the witness tied up with the Kentucky State Fair, this hardly needs further comment from this Court. As important as the state fair is, it in no way rises to the level of necessity as contemplated by *Craig.* And no rationale has been offered by the Commonwealth for Trooper Downs's absence, either at trial or in its briefs before this Court. The trial court abused its discretion when it allowed these witnesses to testify remotely.

*Id.*

In *Campbell*, 671 S.W.3d at 161, the trial court permitted remote testimony by a doctor who was located 100 miles away and was scheduled to work at a hospital that day, and only received a subpoena the day before, regarding the extent of the victim's injuries. We rejected such a basis for depriving the defendant of the right to confrontation, explaining: "There was no showing of necessity, other than convenience to the doctor, or balancing of a victim's interests that justified the surrender of the Defendant's constitutional rights of confrontation. Thus, by allowing Dr. Tucker to testify via Zoom as a convenience to him, the trial court erred." *Id.*

We decline Johnson's invitation to interpret Section 11 of the Kentucky Constitution to provide greater protections than the Sixth Amendment to the United States Constitution. Our Court declared in *See v. Commonwealth*, 746 S.W.2d 401, 402 (Ky. 1988), that "[t]he difference in language [between the Sixth Amendment and Section 11] is not significant and both amendments are simply designed to require that a defendant in a criminal case is entitled to a

25

confrontation with his accusers" and declined to interpret Section 11 more broadly than the Sixth Amendment. The dissent argued that the Section 11 Confrontation Clause should be construed more broadly than the Sixth Amendment's, because Section 11 provides "the right to confront witnesses face to face." *See,* 746 S.W.2d at 404 (Stephens, C.J., dissenting).

Our recent cases further confirm our commitment to apply the Sixth Amendment and Section 11 as providing identical protection. In *Spalding* and *Faughn,* the defendants relied upon both the Sixth Amendment and Section 11 in arguing that their confrontation rights were violated by the remote testimony of witnesses. In *Spalding,* we recognized that we were "the final authority on the Kentucky Constitution" but noted our previous holding "that the protections afforded defendants by the Confrontation Clause of Section 11 and the Sixth Amendment are coextensive" and ultimately concluded that it was "not necessary, at this point, to uncouple ourselves from *Craig*[.]" *Spalding,* 671 S.W.3d at 697. In *Faughn,* we engaged in one discussion in which it was clear we were treating a defendant's right to confrontation under the United States Constitution and the Kentucky Constitution the same, explaining: "Pursuant to *Craig,* a defendant's right of confrontation is balanced against the competing public policy interests set forth by the Commonwealth." *Faughn,* 694 S.W.3d at 347. Based on our precedent, we continue to interpret our Confrontation Clause as equal to that in the Sixth Amendment and will apply the *Craig* test.

26

**4. Did Pam's Remote Testimony Satisfy the *Craig* Test?**

The justification for Pam giving remote testimony was a letter provided by a physician's assistant. However, this letter did not establish that traveling would endanger Pam's health. Instead, the physician's assistant stated: "I agree that travel would be difficult for her[.]" Per *Craig,* such a statement is simply insufficient to establish that remote examination is "necessary."

We further observe that there is no indication that the physician's assistant had any notion that the court appearance Pam was asking to be excused from attending involved a murder trial in which she was a key witness. A physical condition that could warrant a remote appearance in a civil case (to which the Confrontation Clause does not apply) is very different matter.

The Commonwealth's update to the trial court regarding Pam's physical difficulties after that letter was filed did not establish that she was unable to travel. Pam's inability to drive or walk much, and her need for cataract surgery did not show that she could not travel by plane or travel with someone driving her. At best, the Commonwealth established that it would be inconvenient, uncomfortable, or expensive to procure Pam's attendance at the trial. These justifications are insufficient to override Johnson's right to confrontation. Accordingly, we conclude that the "necessary" prong of the *Craig* test was not satisfied. As both the "necessary" prong and the "reliability" prong must be satisfied, a violation of one is sufficient to conclude that the trial court erred in granting the Commonwealth's motion to have Pam testify remotely.

Johnson did, however, also raise concerns before the trial court about the "reliability" prong. He stated that it would be impossible to tell if Pam was being coached if she provided her testimony remotely. The trial court did nothing to address his legitimate concern.

Reliability concerns must be carefully considered and addressed. As to the prototypical statutory exception for confrontation—the "TV testimony" by child victims, which pursuant to KRS 421.350(2) takes place in the courthouse in the presence of the prosecution and defense attorneys and is broadcast in the courtroom—there is no particular question that such testimony would be as reliable as if given before the defendant because the environment where the child is testifying is strictly controlled.

In contrast, it seems doubtful that courts can guarantee that remote testimony as currently conducted through Zoom and similar platforms will be free of outside influence[7]. Yet, all too often, the defendant is expected to trust that such remote testimony will be as reliable as it would be if given in court. We further note that continuing technological advancements can exacerbate such problems. While not a concern here, of utmost importance is ensuring that the person testifying is indeed the witness, and technological trickery is not being used to allow another person to testify in the witness's place.

The right to confrontation is an important safeguard for a fair and reliable trial process and permitting remote testimony should be the last resort.

---

[7] *Zubair, supra,* at 1706.

28

If a witness cannot travel, taking that witness's deposition where the witness is located, with the defendant in attendance, should be pursued first before any consideration is given to whether remote testimony (through Zoom or other means) may be permissible in extraordinary circumstances when a deposition cannot be conducted.

Going forward, we hold that when the Commonwealth seeks permission to allow a witness to testify remotely, the trial court should first consider whether such witness can properly be deposed or whether a delay in the trial would allow for the witness's attendance. In the very limited circumstances in which the trial court concludes that remote testimony is necessary as the only viable option, the trial court must ensure the reliability of such remote testimony. This includes verifying the witness's identity and that no one "off screen" is unduly influencing the witness.

### 5. Standard for Reversal for a Violation of the Confrontation Clause.

Once a Confrontation Clause violation is established, that is not the end of our inquiry, because "finding a confrontation clause error is not, in itself, sufficient to justify reversal." *Faughn,* 694 S.W.3d at 347. Instead, we proceed to considering 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' . . . or put otherwise, that error was harmless beyond a reasonable doubt." *Talbott v. Commonwealth,* 968 S.W.2d 76, 84 (Ky. 1998) (quoting *Chapman v. California,* 386 U.S. 18, 23-24 (1967)).

29

As explained in *Coy v. Iowa,* 487 U.S. 1012, 1021-22 (1988): "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *See Faughn,* 694 S.W.3d at 347; *Campbell,* 671 S.W.3d at 161–62; *Spalding,* 671 S.W.3d at 698 (also quoting from *Talbott,* 968 S.W.2d. at 84 and *Coy,* 487 U.S. at 1021-22).

In *Campbell,* we concluded that the doctor who was testifying remotely regarding the extent of the victim's injuries was a key witness on establishing "an essential element of the Commonwealth's case" and therefore we could not be confident that such remote testimony was harmless beyond a reasonable doubt "because there [was] a reasonable possibility his testimony contributed to the guilty verdict[.]" 671 S.W.3d at 162-63. In contrast, in *Spalding* (regarding remote testimony by three chain of custody witnesses) and *Faughn* (regarding remote testimony by a lab technician about the results of a blood analysis and a professor about toxicology) we ultimately concluded that the objectionable remote testimony was harmless beyond a reasonable doubt as those witnesses' testimony was unnecessary or cumulative, and thus was not needed to establish the defendants' guilt. *Spalding,* 671 S.W.3d at 699; *Faughn,* 694 S.W.3d at 348.

We caution that it is wholly unacceptable for a trial court to permit remote testimony where it arguably does not satisfy the "necessary" prong of

the *Craig* test on the basis that a reviewing court is likely to later deem such error harmless beyond a reasonable doubt. Instead, trial courts must judiciously safeguard defendants' constitutional right to confrontation and err on the side of prohibiting remote testimony.

**6. Was Pam's Testimony Harmless Beyond a Reasonable Doubt?**

In considering the evidence in this case, Pam was a vital witness when it came to Johnson's convictions of the four counts of complicity to traffic in a controlled substance.

The jury instructions clarify how pivotal Pam's testimony was to the complicity to trafficking charges. Each charge was specific to the Wettons' actions and the first three counts were virtually identical save for the date:

A. That in this county on or about [date], and before the finding of the Indictment herein, Bob and Pam Wetton possessed a quantify of two (2) grams or more of methamphetamine; AND

B. That Bob and Pam Wetton knew the substance so possessed was methamphetamine; AND

C. That Bob and Pam Wetton possessed said methamphetamine with the intent to distribute the same to the Defendant, or his agent; AND

D. That prior to the methamphetamine being possessed by Bob and Pam Wetton, the Defendant had engaged in a conspiracy with Bob and Pam Wetton to traffic in a quantify of two (2) grams or more of methamphetamine; AND

E. That the Defendant did so with the intention of promoting or facilitating the offense of trafficking in methamphetamine.

The fourth count eliminated the "in this county" language from A, and instead, in D, placed the "Defendant in Logan County Kentucky."

31

There was certainly evidence supporting convictions on these counts besides Pam's testimony, especially as to the first trafficking charge which related to the first trip as Day testified she was one of several people to go on this trip. We also do not discount the testimony other witnesses provided regarding Johnson's general involvement in the drug trade and how Bob's last trip went awry.

However, just having other evidence to support the guilty verdicts does not satisfy the relevant standard. Pam's first-hand accounts were powerful key evidence about how each of these four trips worked. Her testimony included how Johnson provided them with money, the arrangements he made for them to contact the dealers in Arizona, the amount of methamphetamine that they obtained in Arizona and did or planned to bring back to Johnson, and their actions during these trips to obtain the drugs. This testimony was of vital importance to establishing their actions as was needed to satisfy the jury instructions.

We cannot say that including Pam's testimony, which violated Johnson's right to confrontation, was harmless beyond a reasonable doubt as to all of these counts because there was a reasonable possibility that Pam's testimony contributed to the guilty verdict on each of the trafficking counts. Accordingly, Johnson's convictions and sentences on these four counts must be reversed.

The fact that we conclude there was insufficient evidence to establish complicity to traffic involving Pam and Bob on the specific occasions named without Pam's testimony does not mean that Johnson could not be convicted of

engaging in organized crime, criminal syndicate for trafficking. We observe that the Commonwealth did not have to prove that Johnson actually trafficked in methamphetamine to convict him of engaging in organized crime. *Hill v. Commonwealth*, 125 S.W.3d 221, 233 (Ky. 2004), *overruled on other grounds by Grady v. Commonwealth*, 325 S.W.3d 333, 341–42 (Ky. 2010). Instead, the Commonwealth only had to establish that Johnson "established, maintained or facilitated drug trafficking activities[.]" *Edmonds v. Commonwealth*, 906 S.W.2d 343, 347 (Ky. 1995). The jury could believe there was an ongoing scheme in this manner between the dates named without being certain of the exact details of who was involved and how it all occurred.

This crime required proof that five people (including Johnson) were "persons . . . collaborating to promote or engage in . . . [i]llegal trafficking in controlled substances" to convict Johnson. KRS 506.120(3)(e) (eff. June 25, 2009, to April 25, 2018).[8] "The collaboration in the statute means simply collaborating in the scheme, and it is not necessary for the Commonwealth to show that each participant collaborating in the scheme collaborated with or even was aware of the collaboration of the other participants." *Commonwealth v. Phillips*, 655 S.W.2d 6, 9 (Ky. 1983).

While the indictment named Pam and Bob specifically as two of the five people engaged in trafficking activities with Johnson, the jury instructions did not specifically name them. Instead, it required:

---

[8] As discussed, *supra*, this statute was amended in 2018 by HB 169 and now requires only three participants. KRS 506.120(4)(e).

33

A. That in this county between April 30, 2015, and July 8, 2015, and before the finding of the Indictment herein, the Defendant participated with a group of five (5) or more persons, including the Defendant, collaborating to promote or engage in Trafficking in Methamphetamine on a continuing basis, AND

B. That when he did so, it was his intent to establish or maintain that group, or to facilitate any activities of that group constituting Trafficking in Methamphetamine.

Pam's testimony was not needed to establish the charge of organized crime, criminal syndicate because even without her testimony, there was sufficient evidence from other witnesses that there were at least five people participating. Day testified that Johnson, Day, Pam, Bob, Stokes, and Taylor all planned to and did go to Arizona so that Johnson could traffic in methamphetamine. She also testified regarding his "crowd funding" of the last trip. Stokes testified that he arranged for Johnson or his people to meet up with people he knew in Arizona so Johnson could traffic in methamphetamine at least two times (thus identifying other unnamed people who were part of the scheme as the Arizona connection to obtaining the methamphetamine). Other people testified that they knew Bob was involved in trafficking methamphetamine for Johnson. There was also evidence that Johnson had copiously large amounts of methamphetamine in his possession at various times as a result of these trafficking activities. Therefore, as to the organized crime charges, we conclude that the failure to exclude Pam's testimony was harmless beyond a reasonable doubt.

Similarly, as to the complicity to murder, there was more than sufficient evidence that Johnson was involved in methamphetamine trafficking based on

Day's and Stokes's testimony and based on people observing him with large amounts of methamphetamine. There was also ample evidence that Johnson had been working with Bob to get drugs from Arizona, Johnson wanted Bob dead for ratting him out regarding a drug deal that had gone bad, and Johnson had in fact been involved in Bob's murder, either directly, with Kinder, or through a third party, and that Johnson's Arizona associates had pressured him to "take care of it." While Pam may have had some suspicions that Johnson was involved in Bob's death, it was other witnesses who provided testimony about Johnson's and Kinder's activities.

Pam was not a key witness when it came to establishing Johnson's guilt for this crime as she had no direct evidence as to his involvement in Bob's murder. Therefore, we determine that Pam's testimony regarding the complicity to murder charge was harmless beyond a reasonable doubt when it came to a violation of Johnson's confrontation rights regarding this crime.

**B. Did a KRE 404 Violation Occur which was Prejudicial?—Unpreserved**

Johnson raises two claims arguing violations of KRE 404. The first is regarding testimony by Plunk, that Johnson asked Plunk to make methamphetamine for him, an uncharged crime. The second is regarding testimony by Day, that Johnson and Day had an inappropriate sexual relationship.

Regarding the problematic testimony by Plunk and Day, Johnson argues that he preserved these matters through contemporaneous objections. Johnson

35

further argues that the Commonwealth erred in failing to provide sufficient notice of its intent to use such evidence pursuant to KRE 404(c).

However, Johnson did not make any objections to Plunk's or Day's testimony based on KRE 404(b) or based on a lack of notice pursuant to KRE 404(c). Johnson made objections to Plunk's and Day's anticipated testimony on other grounds, but never referenced KRE 404 or characterized such testimony as being improper character evidence. Johnson failed to preserve at trial that any errors occurred pursuant to KRE 404. Therefore, we engage in palpable error review.

Pursuant to RCr 10.26: "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

In considering what is sufficient to establish manifest injustice, "the required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). "[I]f upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different, the irregularity will be held nonprejudicial." *Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003) (quoting *Abernathy v. Commonwealth*, 439 S.W.2d 949, 952 (Ky. 1969),

*overruled on other grounds* by Blake v. Commonwealth, 646 S.W.2d. 718 (Ky. 1983)).

We observe that on October 17, 2022, the Commonwealth did provide prior notice, pursuant to KRE 404(c), of its intent to introduce evidence that: (1) Johnson engaged in drug trafficking operations in Kentucky and Arizona prior to the Wettons' involvement; and (2) Johnson had previously solicited Hankins to kill Bob. Evidence as to these prior bad acts was admitted at trial. There was also extensive testimony, even without Pam's remote testimony, as to Johnson's ongoing involvement in the drug trade, which included both evidence that which was specific to the trafficking and organized crime charges, and evidence of the other bad acts of drug dealing.

> KRE 404(b) provides:
>
> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
>> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>>
>> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

In evaluating whether the other bad acts evidence is admissible, the trial court should use the following test:

> (1) Is the other bad act evidence relevant for some purpose other than to prove the criminal disposition of the accused? (2) Is evidence of the other bad act sufficiently probative of its

commission by the accused to warrant its introduction into evidence? (3) Does the potential for prejudice from the use of other bad act evidence substantially outweigh its probative value?

*Howard v. Commonwealth*, 595 S.W.3d 462, 475–76 (Ky. 2020).

We conclude that the brief testimony regarding Johnson asking Plunk if he would manufacture methamphetamine for Johnson simply cannot rise to the level of manifest injustice. Such testimony was brief and did not differ very much from other admitted testimony about prior uncharged drug related acts.

While the accusations related to Johnson's sexual relationship with Day could be seen as inappropriate given their pseudo parent-child relationship, and was only mildly relevant as to her motivations, a consensual relationship with an unrelated adult who was well past her majority had a low prejudicial value for influencing the jury regarding whether Johnson was guilty of complicity to Bob's murder. Additionally, the trial court admonished the jury that such testimony was only to be used for the "limited purpose of explaining, if it does, why [Day's] statements to the police were different than her testimony to this jury."

Given the volume of evidence regarding Johnson's motivation to have Bob killed, and the statements witnesses testified he made regarding his plan to have Bob killed and his acknowledgment of taking care of it, the jury was presented with a strong basis to convict Johnson as complicit in Bob's murder. Day's testimony about her intimate relationship with Johnson was presented for the limited purpose of explaining her earlier motivations in protecting Johnson. It could not have any meaningful impact in influencing the jury's

38

guilty verdict on the complicity to murder charge. Under these circumstances, Johnson cannot establish palpable error occurred regarding such testimony about his sexual relationship with Day.

**C. Was there a Confrontation Clause Violation Regarding the Introduction of Hearsay Statements from Johnson's Deceased Son?—Unpreserved**

Johnson argues that allowing Detective Bibb to testify about the statements that his son, Jeremiah, made to Detective Bibb constituted inadmissible hearsay, violated the Confrontation Clause, and "overwhelmingly" prejudiced Johnson.

Detective Bibb testified that when he interviewed Jeremiah four years after Bob's death, Jeremiah could not confirm that Johnson learned of Bob's death from him. The impact of such testimony was lessened by the fact that Detective Bibb admitted during cross-examination that Jeremiah explained he believed his mother told Johnson about Bob's death after seeing the news on Facebook.

We agree that Jeremiah's statements were hearsay which did not qualify for any exception to make them admissible, and their use violated the Confrontation Clause. However, even a Confrontation Clause error must be palpable to require reversal where it is unpreserved. *See Beard v. Commonwealth*, 581 S.W.3d 537, 541 (Ky. 2019); *Peters v. Commonwealth*, 345 S.W.3d 838, 843 (Ky. 2011). Given all the other testimony connecting Johnson to the murder, we cannot say that some inconsistency about who may have told Johnson about Bob's death before Johnson was interviewed by the police resulted in palpable error.

**D. Did the Trial Court Abuse its Discretion when it Failed to Grant Johnson's Motion for Mistrial After the Jury Heard Johnson Admitting He was a Convicted Felon?—Preserved**

Johnson argues he should have been granted a mistrial rather than just an admonishment when it came to the erroneous admission of a portion of his recorded police interview in which he admitted he was a convicted felon. Johnson emphasizes that the parties had agreed this portion of the interview would not be played. The Commonwealth admits this was an error but claims that playing this portion of Johnson's interview was an accident and was appropriately addressed through an admonishment.

Johnson argues that the trial court was incorrect in its reasoning that the jury learning of a prior conviction was no more prejudicial than the activity the jury had already heard about, because the Commonwealth's witnesses to that point "all had self-interested deals with the Commonwealth that could reasonably call their credibility into serious question with the jury" and the jury learning that he "did not just have a personal struggle with indulging in drug usage but an actual conviction could not be cured by the court's admonition" as "the bell could not be un-rung."

While it was undoubtedly an error for this portion of Johnson's interview to be played for the jury, as evidence of a prior conviction violated KRE 404(b) as a prior bad act that was not properly admissible, that does not mean that the only remedy was to declare a mistrial. Trial courts have broad discretion in deciding whether an admonition or mistrial is warranted for such errors, and

we review such decisions for abuse of discretion. *St. Clair v. Commonwealth*, 455 S.W.3d 869, 892 (Ky. 2015).

A mistrial is an extreme remedy which "is reserved for unique circumstances in which the prejudice is so great that a trial cannot continue fairly for both parties." *Commonwealth v. Padgett*, 563 S.W.3d 639, 646 (Ky. 2018). When an admonition is given, we presumed that the jury has followed it, "curing any error that occurred." *Lewis v. Commonwealth*, 642 S.W.3d 640, 645 (Ky. 2022). That presumption "is overcome only when there is an overwhelming likelihood that the jury will be incapable of following the admonition and the impermissible testimony would be devastating to the appellant." *St. Clair*, 455 S.W.3d at 892.

"Breaches of KRE 404(b)'s rule against the admission of prior bad acts as character evidence are generally subject to admonitory cures." *Lewis*, 642 S.W.3d at 643. This includes a disclosure that a non-testifying defendant is a convicted felon. In *Graves v. Commonwealth*, 17 S.W.3d 858, 865 (Ky. 2000), we generally observed that "[t]his type of evidentiary error [a witness stating that the defendant is a convicted felon] is easily cured by an admonition to the jury to disregard the testimony."

In *Lewis*, the trial court read the defendant's indictment to the jury that indicated the defendant had a previous conviction for first-degree trafficking in a controlled substance. The defendant promptly objected and requested a mistrial. Instead, the trial court admonished the jury. We concluded that the trial court reasonably acted within its discretion in admonishing the jury,

which is presumed to be curative, and the defendant failed to establish this error was gravely prejudicial that it required a mistrial instead. 642 S.W.3d. at 643-45. Similarly, in *Torrence v. Commonwealth*, 269 S.W.3d 842, 844-45 (Ky. 2008), we concluded that the Commonwealth's closing statement stating that the defendant was a felon was cured by admonition and harmless given the evidence against the defendant.

The disclosure of Johnson's status as a convicted felon was unfortunate. However, this error was cured by a proper admonition and was harmless given the evidence presented against him. We are satisfied that Johnson's prior acknowledgment that he had a drug problem, and the extensive testimony regarding his criminal activities related to a drug enterprise, did not make it particularly prejudicial for the jury to learn that he had a prior conviction. We are satisfied that the trial court's admonition was sufficient to cure this error and that a mistrial was not thereby warranted.

**E. Does Cumulative Error Require Reversal?**

Johnson argues that the errors he raises are not harmless and require reversal cumulatively because there was no physical evidence linking him to the murder of Bob, his rights under the Confrontation Clause were repeatedly violated, the jury heard improper evidence of his bad acts, the jury was aware of his status as a convicted felon, and he received the maximum sentence.

The cumulative error doctrine provides that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d

42

577, 631 (Ky. 2010). However, errors are cumulative only when they border at least on being prejudicial. *Id.* While a criminal defendant "is guaranteed a fair trial[,]" such a defendant is not guaranteed "a perfect trial, free of any and all errors." *McDonald v. Commonwealth,* 554 S.W.2d 84, 86 (Ky. 1977). Although errors did occur, whether considered individually or cumulatively, they did not render his trial fundamentally unfair.

## III. CONCLUSION

We affirm in part and reverse in part the judgment of the Logan Circuit Court, and remand for further proceedings consistent with this opinion. The trial court erred in allowing a key prosecution witness, Pam, to testify remotely based on mere inconvenience in contravention of Johnson's Confrontation Clause rights pursuant to the Sixth Amendment and Section 11. This error was not harmless beyond a reasonable doubt when it came to Johnson's four convictions for complicity to traffic a controlled substance. We otherwise affirm Johnson's convictions and sentences.

All sitting. All concur.

COUNSEL FOR APPELLANT:


Molly Mattingly
Kayla D. Deatherage
Assistant Public Advocates


COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General